UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SHARON PETTWAY and <br> MARSHA HUBBARD, <br> individually and on behalf of all <br> others similarly situated, <br><br> *Plaintiffs*, <br> v. <br><br> HARMON LAW OFFICES, P.C., <br><br> *Defendant*. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) CIVIL ACTION NO.: 03-10932-RGS <br> ) <br> ) <br> ) <br> ) <br> ) |

**DEFENDANT'S RESPONSE TO**
**PLAINTIFFS' STATEMENT OF UNDISPUTED FACTS**

Defendant Harmon Law Offices, P.C. ("Harmon") hereby responds to the plaintiffs' material facts, which they claim are undisputed. By stating "not disputed" in response to a statement below, Harmon does not concede that the statements, or the facts contained therein, are material. Further, Harmon's responses of "not disputed" are only for summary judgment purposes.

1.   Undisputed.

2.   Undisputed.

3.   Undisputed.

4.   Undisputed.

5.   Undisputed.

6.   Undisputed.

7.   Disputed. The referenced citations do not support the statements made in Paragraph 7. Specifically, there is no evidence to support that Harmon's has developed "standard practices and procedures." Further, there is no evidence to support that Landmark is an "automated case management system." The plaintiffs erroneously suggest to the Court that Harmon's legal practice is

1

"automated," which is unsupported and incorrect. Rather, Mr. Walsh testified and it is undisputed that the Landmark system is "the case management system" for Harmon.

8. Disputed. The referenced citations do not support the statements made in Paragraph 8. It is undisputed that Harmon enters client-specific information into the Landmark system. However, the supporting evidence states and it is undisputed that "Landmark is a customized computer program that is used to track all file activity [for Harmon]" and that "Landmark is used to create the documents required to complete a foreclosure." (See Plaintiffs' Exhibit B, p. 5). Harmon's staff must generate the documents and attorneys review each of the legal documents as the file moves through the foreclosure process. (Walsh Depo. Nov. 2, p. 30, ln. 5 - p. 31, ln. 5).[1]

9. Disputed. The referenced citations do not support the statements made in Paragraph 9. Rather, the citations support and it is undisputed that once property is accurate in the system, that information is carried through for all the documents generated from that file going forward unless manually changed. (Walsh Depo. Nov. 2, p. 47, ln. 20-24; p. 48, ln. 12-18). The plaintiffs offer no support for their assertions that paralegals or legal assistants are "primarily responsible for entering data in Landmark" or that "with minimal data entry, Harmon Law can generate almost all the forms that it needs to process a foreclosure."

10. Disputed. The referenced citations do not support the statements made in Paragraph 10. Rather, the citations support and it is undisputed that "Landmark exports costs to Javlan," which is Harmon's accounting software. (Wagner Depo. Nov. 17, p. 32, ln. 3).

11. Undisputed.

12. Disputed. The referenced citations do not support the statements made in Paragraph 12. Specifically, the citations do not support a finding that "the assigned client's requirements [sic] are [based on] guidelines clearly established by four investors." Rather, Harmon assigns work to teams based on work type and client. (Walsh Depo. Nov. 2, p. 21, ln. 8-10). The purpose of team assignments is "to have the staff become familiar with the client nuances, the differences between the clients and the investors for those clients." (Walsh Depo. Nov. 2, p. 21, ln. 20-22).

13. Disputed. The referenced citations do not support the statements made in Paragraph 13. It is undisputed that there are four investors, including Fannie Mae, HUD, Freddie Mac, and VA. However, the four governmental or quasi-governmental investors have different rules that apply to different foreclosure

---

[1] Any references to deposition testimony are located in the transcripts submitted by the plaintiffs in support of their statement of material facts.

files. (Walsh Depo. Nov. 2, p. 26, ln. 6-17). What Harmon classifies as "conventional loans" have their own set of investors which may be institutional investors, trusts, securitization pool managers, etc. The plaintiffs state that "conventional loans tend to follow Fannie Mae's guidelines," which is a misstatement of the record. Rather, the record reflects the following testimony:

> Q   And for the most part my understanding is that those – the rules for those files follow the Fannie Mae rules, is that generally right?
> A   No.
> Q   Could you explain to me what rules apply in the context of a conventional loan?
> A   In the context of a conventional loan, the clients' specific rules as to how that file should proceed through the office control how we treat that file. With regard to billing the fee, they would follow the Fannie Mae schedule ordinarily.

(Walsh Depo. Nov. 2, p. 27, ln. 5-15). The "timing of the various events" on a conventional loan tend to follow the Fannie Mae guidelines. (Walsh Depo. Nov. 2, p. 32, ln. 8-11).

14. Disputed. The referenced citations do not support the statements made in Paragraph 14. Rather, the cited testimony states, "A payoff request is the request for the total amount due to obtain a discharge of the obligation from the client." (Walsh Depo. Nov. 2, p. 63, ln. 21-24). It is not disputed that Harmon receives requests from mortgagors for payoff or reinstatement estimates for a date when the mortgagor believes the funds will be available. See also, *Defendant's Statement of Undisputed Material Facts*, ¶¶ 44; 46.

15. Disputed. The referenced citations do not support the statements made in Paragraph 15. To the extent that the statements refer to Harmon's letters, the documents speak for themselves. See also, *Defendant's Statement of Undisputed Material Facts*, ¶¶ 61-62.

16. Disputed. The referenced citations do not support the statements made in Paragraph 16. It is not disputed that Harmon uses a "good through" date, which is the date that the mortgagor believes they will have the funds available to bring their loan current or pay the loan off. (*Defendant's Statement of Undisputed Material Facts*, ¶¶ 44-46). However, it is disputed that Harmon has any control over the future date used for the "good through" date because it is determined by the mortgagor and not Harmon. (Walsh Depo. Nov. 17, p. 20, ln. 18-23).

17. Undisputed.

18. Undisputed.

3

19. Disputed. It is undisputed that Harmon's accounting department generates a report entitled "Matter Timeslip and Expense Report" from Javelan. However, it is disputed that this report only includes itemized costs. The record reflects the following testimony:

    Q   Would Javalan contain the legal fees?
    A   Sometimes.
    Q   When would Javelan not contain the legal fees?
    A   It would not contain the fees – can I tell you when it would contain the fees?
    Q   Sure.
    A   It would contain a fee if the file had been filled at a previous point.
    Q   And why would the file have been billed at a previous point, give me an example?
    A   It could have been put on hold.

    (Wagner Depo. Nov. 1, p. 49, 14-24).

20. Undisputed.

21. Undisputed.

22. Undisputed. However, mortgagors do not usually request the amount that they owe today, but are interested to know the amount that they will owe at a point in the future that they designate. (*Defendant's Statement of Undisputed Material Facts*, ¶ 44).

23. Undisputed.

24. Disputed. The referenced citations do not support the statements made in Paragraph 24. It is not disputed that Harmon's accounting department uses the "Cost Estimation Timeline" to estimate costs for a good through date. For an explanation of Harmon's process for the quotation of legal fees and costs, see *Defendant's Statement of Undisputed Material Facts*, ¶¶ 43-63).

25. Disputed. The referenced citations do not support the statements made in Paragraph 25. The statements made in Paragraph 25 reference a document that speaks for itself. The record reflects that Mr. Harmon testified that the purpose of the quoted statement from Plaintiffs' Exhibit B is for Harmon "to collect all of [its] out of pocket costs." (Harmon Depo., p. 50, ln. 19-20).

26. Undisputed. See also, testimony of Mr. Harmon in response to Paragraph 25.

27. Disputed. The referenced citations do not support the statements made in Paragraph 27. The record contains testimony that Harmon sends "high-end estimates" to collect those out of pocket costs that are variable. However, there is

no record testimony to support the plaintiffs' itemization and example of costs. Further, Paragraph 27 quotes from a document, which speaks for itself.

28.   Undisputed.

29.   Disputed.  The referenced citations do not support the statements made in Paragraph 29.  It is undisputed that Mr. Harmon is the owner of Northeast Abstract Company, which is located in the same building as Harmon.  Further, it is undisputed that Harmon uses the services of Northeast Abstract Company.  However, the record specifically states that they are independent employees of another corporation.  (Walsh Depo. Nov. 2, p. 72, ln. 15-17).  However, Northeast Abstract Company does compensate Harmon for certain administrative and expenses, which includes work performed on its behalf by Harmon accounting and administrative employees.  (Wagner Depo. Nov. 17, p. 39, ln. 9-11).

30.   Disputed.  Mark P. Harmon is one of the owners of Commonwealth Auction Associates, Inc.  (Plaintiff's Exhibit C).

31.   Disputed.  The referenced citations do not support the statements made in Paragraph 31.  It is undisputed that Harmon uses the auctioneering services of Irving Schectman; however, Paragraph 31 implies that Commonwealth Auction Company's fees are not representative of the community standard, which is disputed.

32.   Disputed.  The referenced citations do not support the statements made in Paragraph 32.  The investor guideline is the maximum amount of time that the attorney has to complete a foreclosure.  The objective is for the foreclosure to be completed in the shortest period of time needed to be legally compliant.  Foreclosures which exceed this maximum time frame are considered out of compliance by the clients and investors.  (Walsh Depo. Nov. 2, p. 31, ln. 9 - p. 32, ln. 15).

33.   Undisputed; however, the fee may also be established by the client.

34.   Disputed.  Some of the clients and investors do have guidelines that must be followed for apportioning the legal fee.  (Plaintiffs' Exhibit E).

35.   Disputed.  The referenced citations do not support the statements made in Paragraph 35.  Specifically, Mr. Walsh testified to the following:

> Q   Can you tell me to the best of your knowledge how accounting uses this document to calculate what fees are due?
> A   What they do is they look at the file when a request for fees and costs comes from a foreclosure team.  They look at this in conjunction with the cost scheduling, determine where we expect to be through the good-through date, and apply the fee to be

5

        charged, or estimated fee to be charged in the event that we reach the good-through date on the – that is going to be quoted in the reinstatement or payoff.

(Walsh Depo. Nov. 2, p. 198, ln. 16 - p. 199, ln. 3).

36. Disputed. The attorney fee quotes is an estimate "based upon [Harmon's] experience of what would have been completed at the [good-through date]." (Walsh Depo. Nov. 2, p. 202, ln. 10-15). It may also include actual fees already incurred and billed. (Wagner Depo. Nov. 1, p. 49, 14-24).

37. Disputed. Some of the clients and investors do have guidelines that must be followed for apportioning the legal fee. (Plaintiffs' Exhibit E).

38. Disputed. The referenced citation does not support the statements made in Paragraph 38 because it refers to a document, which speaks for itself. There is no evidentiary support for the plaintiffs' characterization of the document.

39. Undisputed.

40. Disputed. Harmon objects to the plaintiffs' characterization of the reinstatement and payoff letters as "demanded" because they are provided upon the mortgagors' requests. Further, the referenced citations do not support the statements made in Paragraph 40. Mr. Walsh testified and it is undisputed that if estimated costs are not incurred, it would result in a refund to the borrower. (Walsh Depo. Nov. 1, p. 169, ln. 15-18). Harmon does not mark up its costs in any way and charges the same amount for attorneys' fees and costs regardless of whether it is being paid by the client, or as a result of a reinstatement payoff in which the mortgagor is remitting funds to Harmon to pay its client. (*Defendant's Statement of Undisputed Material Facts*, ¶ 37).

41. Disputed. The referenced citations do not support the statements made in Paragraph 41. Specifically, the testimony cited to concerns Ms. Hubbard's estimates and was not testimony about Harmon's estimates in general. For a detailed explanation of Ms. Hubbard's refunds, see *Defendant's Statement of Undisputed Material Facts*, ¶¶ 111-115 and ¶¶ 132-134.

42. Undisputed.

43. Undisputed.

44. Disputed. Harmon objects to the plaintiffs' characterization of the reinstatement and payoff letters as "demands" because they are provided upon the mortgagors' requests. Further, the referenced citations contradict the statements made in Paragraph 44. Specifically, Mr. Walsh testified:

6

       Q       Do you tell homeowners that they can get a refund of amounts they pay in excess of the actual costs?
       A       If they ask, certainly, yes.

(Walsh Depo. Nov. 2, p. 29, ln. 23 - p. 30, ln. 2). See also, *Defendant's Statement of Undisputed Material Facts*, ¶ 61.

45. Undisputed. However, it is disputed that Harmon is required to get this information from the mortgagor when they must provide a forwarding address to the United States Postal Service. See also, Response to Paragraph 46.

46. Disputed. The referenced citations do not support the statements made in Paragraph 46. Harmon makes every effort to locate the mortgagors; however, if unable to do so it turns the funds over to abandoned property as a last resort. Its efforts are to "send out a letter with the check initially...[i]f the check comes back and there's no forwarding address, we'll look through the Internet, Lexis, to find an updated address for the mortgagor." (Walsh Depo. Nov. 17, p. 83, ln. 22 - p. 84, ln. 3).

47. Disputed. The referenced citations do not support the statements made in Paragraph 47. The flat fee is capped based on a schedule provided by Harmon's clients, unless the matter is contested by the borrower or requires additional work, in which case Harmon obtains approval for additional fees from its client. (*Defendant's Statement of Undisputed Material Facts*, ¶ 35).

48. Undisputed.

49. Undisputed.

50. Undisputed.

51. Undisputed.

52. Undisputed.

53. Undisputed.

54. The facts in Paragraph 54 are undisputed. However, Harmon objects to the plaintiffs' characterization of the reinstatement and payoff letters as including a "demand" because they are provided upon the mortgagors' requests.

55. It is undisputed that as of October 23, 2002, Harmon had incurred costs of $581.25. However, it is disputed that Harmon would not have been due $2,237.25 on October 31, 2002, which was the good through date. It is also disputed that the only work performed on the file was the preparation of a form complaint. For a description of only some of the activities required before a

7

      complaint can be generated, see Walsh Depo. Nov. , p. 30, ln. 1-24; p. 31, ln. 1-8; p. 49, ln. 20-24; p. 50, ln. 1-21).

56. Disputed. Harmon objects to the plaintiffs' characterization of the reinstatement and payoff letters as a "demand" because they are provided upon the mortgagors' requests. Further, the referenced citations do not support the statements made in Paragraph 56. There is no support for the statement that "these estimates are acknowledged to be 'high-end' estimates that exceed the costs likely to be incurred."

57. Disputed. Four of the seven cost items listed were the actual expected costs for those items and not high-end estimates of costs. Harmon estimates the publication cost and sheriff's fee because those costs are not fixed but variable. Compare Plaintiffs' Exhibit H to Plaintiffs' Exhibit J.

58. Disputed. The estimated legal fees of $1,100 that were included in the October 23, 2002 letter were for a good through date of October 31, 2002, which was stated in the letter. It is irrelevant what Harmon had completed on Pettway's file on October 23, 2002 because Harmon was preparing a requested estimate for what would be due on October 31, 2002, which included the actual costs incurred to date as well as estimated costs for sheriff's service, title update, recording and publication. (*Defendant's Statement of Undisputed Material Facts*, ¶ 80).

59. Undisputed; however, this is irrelevant as Harmon is performing its services for a flat fee.

60. Disputed. The referenced citations do not support the statements made in Paragraph 60. The plaintiffs reference a document, which speaks for itself. However, the plaintiffs offer no evidentiary support for their characterization of the document, which is inaccurate and disputed.

61. Undisputed; however, this is irrelevant as Harmon is performing its services for a flat fee.

62. Undisputed.

63. Disputed. By the time the foreclosure date has been set, Harmon had completed approximately 34 tasks on Ms. Pettway's case, some of which require completion of numerous fields. (Plaintiff's Exhibit F).

64. The facts of Paragraph 64 are undisputed. However, Harmon objects to the plaintiffs' characterization of the reinstatement and payoff letters as "demand" because they are provided upon the mortgagors' requests.

65. Undisputed.

66. The facts of Paragraph 66 are undisputed. However, Harmon objects to the plaintiffs' characterization of the reinstatement and payoff letters as "demanded" because they are provided upon the mortgagors' requests.

67. Disputed. Harmon objects to the plaintiffs' characterization of the reinstatement and payoff letters as "demanded" because they are provided upon the mortgagors' requests. Further, the referenced citations do not support the statements made in Paragraph 67. There is no evidentiary support for the plaintiffs' accusations that Harmon "routinely fails to correctly estimate its costs." Harmon does not control when a sheriff will achieve service and, therefore, will quote the estimated cost of service if it might be achieved between when the reinstatement and payoff letter is sent and the expiration date of the reinstatement or payoff. (*Defendant's Statement of Undisputed Material Facts*, ¶ 49).

68. Undisputed. Ms. Pettway paid no more than $21.40 for sheriff's service.

69. The facts of Paragraph 69 are undisputed. However, Harmon objects to the plaintiffs' characterization of the reinstatement and payoff letters as a "demand" because they are provided upon the mortgagors' requests.

70. Disputed. A number of these items were the actual expected costs that the mortgagor would incur if the obligation was paid off by the expiration date. See Response to Paragraph 57.

71. Undisputed.

72. Disputed. The referenced citations do not support the statements made in Paragraph 72. As of November 21, 2002 (the date the report was run), Ms. Pettway had incurred $251.48 in actual costs for a first publication out of three. (Plaintiffs' Exhibit J).

73. Disputed. Harmon objects to the plaintiffs' characterization of the reinstatement and payoff letters as "demanded" because they are provided upon the mortgagors' requests. Harmon does not run the publications, the newspaper does. The next activity was to prepare for and attend the sale. (Plaintiffs' Exhibit F).

74. Undisputed.

75. Undisputed.

76. Disputed. Harmon was retained by two distinct clients to foreclose each respective mortgage interest. (*Defendant's Statement of Undisputed Material Facts*, ¶¶ 96, 116).

77. Disputed. The referenced citations do not support the statements made in Paragraph 77. Harmon did not admit that it "incorrectly billed" Ms. Hubbard but

rather that it's estimate did not match the amount that it billed Ms. Hubbard. (Walsh Depo. Nov. 17, p. 155, ln. 7-8).

78. Disputed. The referenced citations do not support the statements made in Paragraph 78. In fact, the citations have no relevancy to the statements made in Paragraph 78. It is undisputed that the maximum amount of attorneys' fees that Harmon could be paid by the investor on Ms. Hubbard's first mortgage was $1,250.00.

79. The facts of Paragraph 79 are undisputed. However, Harmon objects to the plaintiffs' characterization of the reinstatement and payoff letters as a "demand" because they are provided upon the mortgagors' requests.

80. Disputed. Four of the seven items were the actual expected costs and not high-end estimates of costs. See Responses to Paragraphs 57 and 70.

81. Undisputed. Ms. Hubbard paid no more than $21.40 for sheriff's service.

82. Disputed. The estimated legal fees of $975 that were included in the November 26, 2002 letter were for a good through date of December 6, 2002, which was stated in the letter. It is irrelevant what Harmon had completed on Hubbard's file on November 26, 2002 because Harmon was preparing a requested estimate for what would be due on December 6, 2002. Further, Ms. Hubbard understood that Harmon's letters she received in response to her inquiries were estimates of what she would owe at a future date. (*Defendant's Statement of Undisputed Material Facts*, ¶ 102).

83. The facts of Paragraph 83 are undisputed. However, Harmon objects to the plaintiffs' characterization of the reinstatement and payoff letters as a "demand" because they are provided upon the mortgagors' requests.

84. Disputed. The estimated legal fees of $1100 that were included in the December 2, 2002 letter were for a good through date of December 15, 2002, which was stated in the letter. It is irrelevant what Harmon had completed on Hubbard's file on December 2, 2002 because Harmon was preparing a requested estimate for what would be due on December 15, 2002. Further, Ms. Hubbard understood that Harmon's letters she received in response to her inquiries were estimates of what she would owe at a future date. (*Defendant's Statement of Undisputed Material Facts*, ¶ 102).

85. Undisputed.

86. Disputed. Harmon objects to the plaintiffs' characterization of the reinstatement and payoff letters as a "demand" because they are provided upon the mortgagors' requests. It is undisputed that Harmon issued a check to Ms. Hubbard for her first mortgage in the amount fo $1,902.16 on April 28, 2003. However, it is disputed

that Harmon knew Ms. Hubbard had "moved out" and there is no evidentiary support in the record for that statement.

87. Disputed. Four of the six items were the actual expected costs and not high-end estimates of costs. See Responses to Paragraphs 57, 70 and 80.

85.[2] Undisputed.

86. Undisputed.

87. Undisputed.

88. Undisputed. Ms. Hubbard paid no more than $19.40 for sheriff's service.

89. Disputed. The estimated legal fees of $1200 that were included in the January 22, 2003 letter were for a good through date of January 31, 2003, which was stated in the letter. It is irrelevant what Harmon had completed on Hubbard's file on January 22, 2003 because Harmon was preparing a requested estimate for what would be due on January 31, 2003. Further, Ms. Hubbard understood that Harmon's letters she received in response to her inquiries were estimates of what she would owe at a future date. (*Defendant's Statement of Undisputed Material Facts*, ¶ 102). In addition, the estimated legal fees and costs of $2,024 included the expected costs for the Order of Notice process that would be incurred by Harmon during the intervening period, as well as the costs for the dismissal of the Land Court action had the file reinstated prior to the issuance of the judgment from the Land Court. (*Defendant's Statement of Undisputed Material Facts*, ¶ 123).

90. Disputed. On April 1, 2003, Harmon received payoff funds for Hubbard's second loan. The payoff was sent to its client and after paying its fees and costs, there was a refund due of $2,318.37. This refund was primarily the result of the fact that no publications ($1600) or auction fees ($400) were incurred and the actual legal fee that was charged was $275 less than the amount that was quoted because the file had not proceeded as far as Harmon expected when it provided the estimate. (*Defendant's Statement of Undisputed Material Facts*, ¶ 132).

91. Disputed. On April 21, 2003, Harmon sent a refund check to Ms. Hubbard at the property address. Apparently, Ms. Hubbard did not obtain a forwarding order for her mail when she moved. The check was returned to Harmon. On October 16, 2003, a second check was issued to Ms. Hubbard. (*Defendant's Statement of Undisputed Material Facts*, ¶ 134).

---

[2] The numbered paragraphs in Plaintiffs' Statement of Undisputed Facts were not chronological. In its response, defendant uses numbers to correspond to the plaintiffs' unsequential numbers to maintain accuracy.

DEFENDANT,
By its attorneys,


   **/s/ Kathryn E. Pieczarka**
Evan T. Lawson (BBO# 289280)
Kathryn E. Pieczarka (BBO# 658785)
LAWSON & WEITZEN, LLP
88 Black Falcon Avenue, Suite 345
Boston, MA 02210
(617) 439-4990


## CERTIFICATE OF SERVICE

   I, Kathryn E. Pieczarka, certify that on **April 7, 2005** a copy of the foregoing DEFENDANT'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNDISPUTED FACTS was filed electronically. Notice of this filing will be sent by e-mail to all counsel of record by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

   **/s/ Kathryn E. Pieczarka**
Kathryn E. Pieczarka